# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Samantha Orduno,

|                                          |                                          |
|------------------------------------------|------------------------------------------|
| Plaintiff,                               | **MEMORANDUM OPINION AND ORDER** |
|                                          | Civil No. 14-1393 ADM/DTS                |
| v.                                       |                                          |

Richard Pietrzak, in his individual capacity as
the Chief of Police of the City of Dayton; City
of Dayton; John and Jane Does (1-120),
acting in their individual capacity as
supervisors in the City of Dayton,

Defendants.

_____

Sonia L. Miller-Van Oort, Esq., Jonathan A. Strauss, Esq., Lorenz F. Fett, Jr., Esq., and Robin M. Wolpert, Esq., Sapientia Law Group, PLLC, Minneapolis, MN; and Susan M. Holden, Esq., Jeffrey M. Montpetit, Esq., and Marcia K. Miller, Esq., SiebenCarey, Minneapolis, MN on behalf of Plaintiff.

Stephanie A. Angolkar, Esq., Jon K. Iverson, Esq., and Susan M. Tindal, Esq., Iverson Reuvers Condon, Bloomington, MN, on behalf of Defendants Richard Pietrzak and City of Dayton.

_____

## I. INTRODUCTION

This matter is before the undersigned United States District Judge for a ruling on Plaintiff Samantha Orduno's ("Orduno") Amended Motion to Amend Judgment Under Rule 59(e) and Rule 60(a) [Docket No. 259], Motion for a New Trial Under Rule 59(a) [Docket No. 265], and Motion for an Award of Reasonable Attorneys' Fees and Costs Under 18 U.S.C. § 2724 [Docket No. 233]. Also before the Court are Defendants City of Dayton ("City of Dayton" or "City") and Richard Pietrzak's ("Pietrzak") (collectively, "Defendants") Motion to Strike Untimely Motion for New Trial, Untimely "Amended Motion" to Amend Judgment and Untimely Motion for Attorneys' Fees [Docket No. 269], and City of Dayton's Renewed Motion for Judgment as a Matter of Law [Docket No. 247]. For the reasons set forth below, the Amended Motion to

Amend Judgment is granted, the Motion for a New Trial is denied, the Motion for Attorneys'

Fees and Costs is granted in part and denied in part, the Motion to Strike is denied, and the

Renewed Motion for Judgment as a Matter of Law is denied.

## II.  BACKGROUND

This case began as a putative class action under the Driver's Privacy Protection Act, 18

U.S.C. § 2721, et seq.  ("DPPA" or the "Act").  Compl. [Docket No. 1] ¶¶ 227–254.  The DPPA

prohibits "any person" from "knowingly . . . obtain[ing] or disclos[ing] personal information,

from a motor vehicle record, for any use not permitted under Section 2721(b) of this title."

18 U.S.C. § 2722.  The Act lists numerous permitted uses, including "use by any government

agency, including any court or law enforcement agency, in carrying out its functions . . . ."  18

U.S.C. § 2721(b)(1).

Orduno, the former Dayton City Administrator, alleged that former Dayton Police Chief

Pietrzak violated the DPPA by accessing her personal information[1] and that of at least 850 other

individuals from the Minnesota Driver and Vehicle Services database (the "DVS Database") for

an impermissible purpose.  Compl. ¶¶ 42–53.  Orduno further alleged that the City knew of

Pietrzak's unlawful accesses, and that the City and its supervisors failed to monitor and prevent

the accesses.  Id. ¶¶ 54–55, 69–76.

### A.  Events Giving Rise to Lawsuit

On November 9, 2012, a photocopy of Orduno's paycheck receipt was found in the copy

machine in the City's main office while Orduno was on vacation.  First Miller Aff., June 22,

---

[1] The information at issue in this case is personal data typically reflected on a driver's license.  It does not include social security number or medical information other than eyeglass restriction and donor status.

2015 [Docket No. 37] Ex. A ("Bankes Report") at D245.  The photocopy exposed only the corners of the paycheck receipt, and the visible data that appeared in those corners was public data.  Id. at D245, D259.  Orduno perceived the finding of the photocopy as evidence of a possible data practices violation.  She contacted the City Administrator from White Bear Lake, Minnesota to inquire whether White Bear Lake Police Chief Lynne T. Bankes ("Bankes") would conduct a criminal investigation of the incident.  Second Miller Aff., Sept. 11, 2015 [Docket No. 49] Ex. 1 ("Bankes Dep.") at 19–21; Orduno Decl., Sept. 11, 2015 [Docket No. 50] ¶¶ 13–14.  Orduno and Bankes knew each other from their previous employment with the City of Fridley.  Bankes Dep. at 20; First Angolkar Aff., Aug. 5, 2015 [Docket No. 46] Ex. 7 at 1.  Bankes was assigned to the investigation, and Orduno provided Bankes with a written account of what she believed had happened.  Bankes Report at D245; Bankes Dep. at 19–20, 76–77.

As part of her investigation, Bankes interviewed several City employees.  Bankes Report at D246–52.  Pietrzak declined to speak with Bankes without an attorney, but contacted his union attorney to arrange for a meeting with Bankes.  Id. at D249.  The union attorney left a message for Bankes on December 13, 2012, stating that Pietrzak would be available to speak with Bankes after the first of the year.  Id.  Bankes did not follow up with Pietrzak or his attorney before concluding her investigation.  See id. at D255.

During the investigation of the photocopied paycheck receipt, Orduno informed Bankes "that there was an honesty and integrity issue with some City staff," and that she was "concerned that her private personal data was released."  Id. at D252.  Orduno told Bankes that Pietrzak was her "primary suspect" because he had access to City Hall at any time of the day or night.  Id.  Orduno also conveyed to Bankes that she felt Pietrzak was "out to get her."  Bankes Dep. at 78.

Based on Orduno's concerns and suspicions, Bankes contacted the Minnesota Department of Motor Vehicle Services ("DVS") to determine whether Orduno's driver's license or license plate number had been accessed in the DVS Database by any law enforcement officer in Minnesota. Bankes Report at D252. DVS provided Bankes with a printout showing that Orduno's name had been accessed in the DVS Database 14 times between January 19, 2010 and October 4, 2012. Id. at D252, Ex. A. Seven of the accesses were made by Pietrzak. Id.[2] The accesses were not made by entering Orduno's motor vehicle information, which led Bankes to conclude that "the reason for the entry into DVS was not due to a traffic stop violation, but for another reason." Id. at D252. Orduno informed Bankes that she had not been stopped for a traffic violation during that time period and could not think of any reason that officers would have been required to search her name in the DVS Database. Id. Bankes concluded that the accesses were unauthorized and that Pietrzak had violated the DPPA and other statutes. Id. at D253; Bankes Dep. at 59.

Bankes then contacted DVS to request all access data by Pietrzak for the past six months "to see if Chief Pietrzak was only illegally accessing [Orduno's] name and data or if this practice was pervasive." Bankes Report at D253. In response, a DVS support services supervisor sent Bankes an email requesting to deactivate Pietrzak's access because their review of the inquiry was "so disturbing" that DVS planned to discontinue his access. Id. Bankes requested that the access remain open during her investigation. Id. DVS then provided Bankes with a list showing that Pietrzak had accessed information for more than 850 people during the six month period

---

[2] The other accesses were by law enforcement entities from five other cities or counties. Id. at D253. Orduno did not include those entities as defendants in this case.

4

covered by the report.  Id.

Upon reviewing the list of accesses, Bankes became "immediately concerned" because the list included "numerous" accesses for Pietrzak's family members, City of Dayton's police officers, and the City's police secretary.  Id. at D253–54.  Pietrzak had also accessed the DVS Database for the Hennepin County sheriff, police chiefs from three other cities, most of Dayton's City Council, members of the City of Dayton's staff, the City of Dayton's past and future mayor, two individuals close to the mayor, a public safety commissioner, and persons from nearby communities who were running or had run for public office.  Id.  "Many" of those accessed were female.  Id. at D254.  Additionally, "very few" of the entries on the DVS report were preceded by a license plate entry, indicating the accesses were not likely to have been the result of a traffic stop.  Id.

Bankes did not compare the list to an incident report or report of service calls for the City of Dayton police department, nor did she contact any individuals on the list, review the personnel files of the City of Dayton employees on the list, or speak to Pietrzak about the reasons for the accesses.  Bankes Dep. at 62, 82–83.  Nevertheless, Bankes concluded from her review of the list that "there could reasonably be hundreds of counts of a violation of the law."  Bankes Report at D254.

Bankes prepared a report documenting the results of her investigation concerning the photocopied paycheck receipt.  See generally Bankes Report.  The report concludes that the photocopied data was public data, and that there was "little evidence to criminally charge anyone" with violating Orduno's privacy based on the photocopied paycheck receipt.  Id. at D254.  However, the report also finds that the "bigger issue [was] the absolute disregard of the

law by the Police Chief," and that there was "more than sufficient evidence" to bring charges against Pietrzak based on his "illegal" accesses to the DVS Database.  Id.

**B.  Case Commenced**

On May 2, 2014, Orduno filed this lawsuit alleging that Pietrzak violated the DPPA when he accessed her personal information and that of approximately 850 other persons for an impermissible purpose, and that the City, through its supervisors, knew of Pietrzak's unlawful accesses and failed to monitor and prevent the accesses.  Compl. ¶¶ 42–55, 69-76.  Orduno's requested relief included punitive damages for Defendants' "willful or reckless disregard of the law."  18 U.S.C. § 2724.

Pietrzak initially denied the allegations and argued that he accessed Orduno's private data for the permissible law enforcement purpose of investigating whether she was using an alias to hide her true name.  First Angolkar Aff. Ex. 4 (Pietrzak Answer Interrogs.) at 8–9.

**C.  Time-Barred Accesses Dismissed**

On October 28, 2014, the Court granted in part a Motion to Dismiss by Defendants, holding that Orduno's claims for accesses occurring before May 2, 2010 were barred by the four year statute of limitations under the DPPA.  Mem. Op. & Order, October 28, 2014 [Docket No. 24].  Pietrzak accessed Orduno's personal information on sixteen different dates, ten of which occurred between September 7, 2005 and May 12, 2009.  See Pl.'s Resp. Defs.' Objs. [Docket No. 94] at 4–5.  Therefore, accesses made by Pietrzak on six occasions on or after May 2, 2010 remained in the case.  Those accesses occurred on August 19, 2010; April 26, 2011; May 19, 2011; November 3, 2011; May 16, 2012; and October 4, 2012.  Id.; Compl. Ex. A.

### D. Class Certification Denied

On November 10, 2015, the Court denied Orduno's Motion to Certify Class Action. <u>See</u> Mem. Op. & Order, Nov. 10, 2015 [Docket No. 54]. The Court concluded that Orduno failed to satisfy the predominance standard under Federal Rule of Civil Procedure 23(b) because common questions of fact or law did not predominate over individualized questions. Specifically, common evidence could not suffice to make a prima facie case for the class because each access would need to be individually examined to determine whether Pietrzak obtained the information for a permissible purpose such as a law enforcement function. In December 2015, the Eighth Circuit denied a petition by Orduno to appeal the denial of class certification. <u>See</u> Notice USCA J. [Docket No. 56]; Notice USCA Mandate [Docket No. 57].

### E. Answer Amended

In February 2017, the Court issued a Jury Trial Notice [Docket No. 132] that trial would begin on May 22, 2017. On April 27, 2017, Defendants filed an Amended Answer [Docket No. 155] which admitted that Pietrzak had accessed Orduno's private information for an impermissible purpose after May 2, 2010, but denied the direct and vicarious liability claims against the City of Dayton. <u>Compare</u> Compl. ¶¶ 207–16, 223 <u>with</u> Am. Answer ¶¶ 65–70, 73.

### F. Pretrial Rulings

On May 15, 2017, the Court held a pretrial conference to address motions in limine [Docket Nos. 163, 165, 171, 173, 181, 184, 186] filed by Defendants. <u>See</u> Min. Entry [Docket No. 218]. During the conference, the Court made the following rulings which were implemented at trial. First, the direct liability claim against the City was dismissed because there was no evidence that the City gave Pietrzak access for an impermissible purpose. Second, there were

six obtainments of Orduno's personal information because Pietrzak had accessed Orduno's information on six dates, and the viewing of multiple information categories during a given access session would be counted as a single obtainment. Third, each of the six obtainments carried a minimum of $2,500 in statutory damages under § 2724(b)(1), for a total minimum of $15,000. Fourth, time-barred accesses and accesses of non-party data were inadmissable on relevancy grounds and because the value of the evidence was more prejudicial than probative. Relatedly, the Bankes investigation was admissible only to document accesses of Orduno's data. Fifth, the City's actions following the Bankes Report, including whether the City took action to investigate the accesses or to discipline Pietrzak for them, was inadmissible on relevancy grounds. Sixth, any reference to the damages provision of DPPA entitling a plaintiff to no less than $2,500 for a violation of the statute would be excluded at trial, because liquidated damages would be addressed as a post-judgment issue in post-trial motions. Finally, Orduno would not be allowed to seek damages against the City under a theory of direct liability because the direct liability claim against the City had been dismissed, but the City could be held vicariously liable for damages awarded against Pietrzak, including punitive damages.

## G. Trial

On May 22, 2017, the Court commenced a trial on the issue of damages for Pietrzak's admitted violations of the DPPA. At the close of Orduno's case in chief, the City moved for judgment as a matter of law on Orduno's vicarious liability claim. The Court denied the motion without prejudice, concluding that the City can be held vicariously liable under the DPPA based on Pietrzak's admission of liability. After three days of trial, the case was submitted to the jury on the afternoon of May 24, 2017. Because the direct liability claim against the City had been

dismissed, the damage-related questions on the Special Verdict Form were directed to Pietrzak's improper conduct and did not include a question about the City's misconduct. <u>See</u> Verdict [Docket No. 228].

On May 25, 2017, the jury awarded actual damages of $0 and punitive damages of $85,000 against Pietrzak. <u>Id.</u> Judgment reflecting the jury's verdict was dated and filed on May 25, 2017, and was entered by the clerk on May 26, 2017. <u>See</u> Judgment [Docket No. 229]; First Miller-Van Oort Aff., June 30, 2017 [Docket No. 277] Exs. 1, 2. Following the jury verdict and the entry of judgment, the parties filed these post-trial motions.

## III. DISCUSSION

### A. Defendants' Motion to Strike Untimely Motions

Defendants argue that Orduno's Amended Motion to Amend Judgment, Motion for New Trial, and Motion for Attorneys' Fees must be stricken as untimely because they were filed one day late. The Motion to Strike fails because it is based on Defendants' erroneous contention that Judgment was entered May 25, 2017.

Under Federal Rule of Civil Procedure 58(c)(1), entry of a judgment occurs "when the judgment is entered in the civil docket under Rule 79(a)." In turn, Rule 78(a)(3), requires that a docket entry for a judgment include the judgment's "date of entry." Here, the Judgment is listed in Docket Entry 229. Although Docket Entry 229 is dated May 25, 2017, it expressly states that the Judgment was "Entered: 05/26/2017." Additionally, the District Court's automated electronic filing notification system states that the Judgment "was <u>entered</u> on 5/26/2017 at 7:47 AM CDT and filed on 5/25/2017." First Miller-Van Oort Aff. Ex. 1 (emphasis added). Thus, the case docket unequivocally shows that Judgment was entered on May 26, 2017. <u>See</u> <u>Jones v.</u>

Gann, 703 F.2d 513, 514 (11th Cir. 1983) ("The time for filing a notice of appeal begins to run not on the date that the judgment is filed but on the date the judgment is actually entered on the docket.").

Because the Judgment was entered on May 26, 2017, Orduno's Amended Motion to Amend Judgment, Motion for New Trial, and Motion for Attorneys' Fees are timely and Defendants' Motion to Strike is denied.[3]

## B.  City of Dayton's Renewed Motion for Judgment as a Matter of Law

The City of Dayton argues that it is entitled to judgment as a matter of law on Orduno's claim against the City for vicarious liability because vicarious liability does not apply to the DPPA or to the circumstances of this case.

Rule 50(b) of the Federal Rules of Civil Procedure governs renewed motions for judgment as a matter of law.  Under Rule 50, the court may allow judgment on the verdict, order a new trial, or direct the entry of judgment as a matter of law.  Fed. R. Civ. P. 50(b)(1–3). The standard of review for granting a Rule 50(b) motion is whether sufficient evidence exists to support the jury verdict.  A motion for judgment as a matter of law should only be granted when

---

[3] Orduno requests reimbursement of attorneys' fees and costs that she expended in responding to Defendants' Motion to Strike.  She argues that Defendants' Motion "appears to be a misrepresentation to the Court by Defendants about the date of entry of judgment," and that the Motion "was clearly made to increase the cost of litigation and to burden Plaintiff."  Pl.'s Mem. Law Supp. Mot. Strike [Docket No. 276] at 7–8.  Orduno further contends that Defendants' counsel failed to meaningfully participate in a meet-and-confer which could have avoided the Motion.  Orduno's request for reimbursement of attorneys' fees and costs expended on the Motion to Strike is denied.  At the time Defendants filed the Motion to Strike, there was no need for a meet-and-confer as Defendants had communicated by email with Orduno's counsel about the Motion and were aware of Orduno's position.  See First Miller-Van Oort Aff. Ex. 8. Additionally, the motion was not frivolous or filed in bad faith.

"all the evidence points one way and is susceptible of no reasonable inferences sustaining the position of the nonmoving party." Washburn v. Kan. City Life Ins. Co., 831 F.2d 1404, 1407 (8th Cir. 1987) (citation omitted). In deciding a motion for judgment as a matter of law, the court must view the evidence in the light most favorable to the party who prevailed before the jury, making all reasonable inferences in that party's favor. Id. (citation omitted).

The DPPA is silent on the issue of vicarious liability. No Circuit Court has yet addressed whether vicarious liability applies to DPPA claims. Although cases within this district have reached differing conclusions on the issue, most hold that the DPPA imposes vicarious liability upon municipalities for the actions of their employees. See, e.g., Myers v. Aitkin Cty., No. 14-473, 2017 WL 1198536, at *8 (D. Minn. Mar. 27, 2017) (holding vicarious liability is available under the DPPA); Mallak v. City of Brainerd, No. 13-2119, 2017 WL 440249, at *15 (D. Minn. Feb. 1, 2017) (same); Karasov v. Caplan Law Firm, No. 14-1503, 2016 WL 6836930, at *10 (D. Minn. Nov. 18, 2016) (same); Rollins v. City of Albert Lea, No. 14-299, 2016 WL 6818940, at *12 (D. Minn. Nov. 17, 2016) (same); Potocnik v. Carlson, No. 13-2093, 2016 WL 3919950, *6 (D. Minn. July 15, 2016) ("In American law, vicarious liability is the rule, not the exception, and the Court can discern no reason why DPPA cases should be exempt from the general rule."); but see Jessen v. Blue Earth Cty., No. 14-1065, 2014 WL 5106870, at *4 n.4 (D. Minn. Oct. 10, 2014) (holding vicarious liability does not apply to DPPA because statute's plain language requires that defendant itself must have acted to be liable); Weitgenant v. Patten, No. 14-255, 2016 WL 1449572, at *7 (D. Minn. Apr. 12, 2016) (declining to apply vicarious liability based on the circumstances of the case). At least three district courts from other federal jurisdictions have also held that the DPPA imposes vicarious liability upon municipalities for the actions of

their employees.  See Margan v. Niles, 250 F. Supp. 2d 63, 72–76 (N.D.N.Y. 2003); Schierts v. City of Brookfield, 868 F. Supp. 2d 818, 821–22 (E.D. Wis. 2012); Menghi v. Hart, 745 F. Supp. 2d 89, 99 (E.D.N.Y. 2010).

In determining that vicarious liability applies to municipalities under the DPPA, courts recognize the general principle that "[w]hen Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules."  See Margan, 250 F. Supp. 2d at 74 (quoting Meyer v. Holley, 537 U.S. 280, 285 (2003)); Schierts, 868 F. Supp. 2d at 822 (same).  Under this principle, traditional vicarious liability rules will be applied if they are consistent with the federal statute's provisions and Congress' intent.  Jones v. Federated Fin'l Reserve Corp., 144 F.3d 961, 965–66 (6th Cir. 1998).

Federal tort-related vicarious liability rules include the doctrine of apparent authority, which provides that a principal is liable for the torts of its agents when the agents act with apparent authority.  Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp., 456 U.S. 556, 567 (1982).  In Hydrolevel, the Supreme Court applied the doctrine of apparent authority to antitrust statutes after finding that vicarious liability was consistent with Congress' intent to encourage competition.  Id. at 570–76.  The Supreme Court reasoned that if an organization is liable for the antitrust violations of its agents acting with apparent authority,

> it is much more likely that similar antitrust violations will not occur in the future.  Pressure will be brought on the organization to see that its agents abide by the law.  Only [the organization] can take systematic steps to make improper conduct on the part of all its agents unlikely, and the possibility of civil liability will inevitably be a powerful incentive for [the organization] to take those steps.

Id. at 572–73 (internal quotations, citation, and alterations omitted).

12

Courts applying vicarious liability to municipalities under the DPPA have similarly concluded that the municipalities are in the best position to prevent DPPA violations by their employees, and that the threat of vicarious liability encourages municipalities to adopt appropriate policies, procedures, and training to prevent the misuse of motor vehicle data. See Mallak, 2017 WL 440249, at *17; Potocnik, 2016 WL 3919950, at *7; Margan, 250 F. Supp. 2d at 74–75. Moreover, "once a law-enforcement officer has exceeded the broad bounds of the government-function exception [under § 2721(b)(1) of the DPPA], shielding his employer from vicarious liability serves no purpose other than to weaken the municipality's incentive to prevent future violations." Potocnik, 2016 WL 3919950, at *7. Id. Thus, this Court holds vicarious liability may apply to a municipality whose employees violate the DPPA.

The City argues that it should not be held vicariously liable for Pietrzak's unlawful accesses because he was acting outside the scope of his employment. However, under the federal rule of apparent authority, liability is premised on the agent's position in facilitating the wrongdoing. Hydrolevel Corp., 456 U.S. at 566. Thus, an agent acting outside the scope of their employment will be liable if the agent "was aided in accomplishing the tort by the existence of the agency relation." Restatement (Second) of Agency § 219(2)(d) (1958). Here, Pietrzak's position as the City's Chief of Police facilitated the alleged wrongdoing because he had access to the DVS Database as a result of his position. Trial Tr. Vol. II [Docket No. 290] at 128:21–129:25. Therefore, vicarious liability applies.[4]

_____

[4] The City argues that the aided-in-agency relation theory was abandoned by the most recent publication of the Restatement (Third) of Agency in 2006. Under the newer Restatement, an employer is subject to vicarious liability for a tort committed by its employee acting within the scope of employment, which occurs "when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control. An employee's act is not

The City insists that the policy argument for applying the aided-in-agency relation theory to the DPPA—namely, that entities will be motivated to perform routine monitoring and training to ensure that private records are accessed only for permissible purposes—is not met in this case because Orduno was Pietrzak's supervisor at the time of Pietrzak's improper accesses and failed to monitor his computer usage. The City argues that Orduno should not be rewarded for failing to discover Pietrzak's unlawful conduct. However, imposing vicarious liability here is consistent with the purposes of the DPPA because it gives the City an incentive to prevent future violations.

Because vicarious liability applies, the City's motion for judgment as a matter of law is denied.

## C. Orduno's Motion for a New Trial

Orduno argues that a new trial is warranted based on evidentiary and legal errors made by the Court before and during trial.

The decision whether to grant a new trial under Federal Rule of Civil Procedure 59(a) is committed to the discretion of the district court. Pulla v. Amoco Oil Co., 72 F.3d 648, 656 (8th Cir. 1995). "A new trial is required only when necessary to avoid a miscarriage of justice." Gearin v. Wal-Mart Stores, Inc., 53 F.3d 216, 219 (8th Cir. 1993) (citing McKnight v. Johnson Controls, Inc., 36 F.3d 1396, 1400 (8th Cir. 1994)). Inaccuracies or errors should not serve as a basis for setting aside a verdict unless prejudicial error is shown. Buchholz v. Rockwell Int'l

_____

within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer." Restatement (Third) of Agency § 7.07. When Congress drafted the DPPA in 1994, however, it was "legislat[ing] against a legal background of ordinary tort-related vicarious liability rules" that included the aided-in-the-agency-relation rule as it existed at that time, and "consequently intend[ed] its legislation to incorporate those rules." Margan, 250 F. Supp. 2d at 73 (quoting Meyer, 537 U.S. at 285).

Corp., 120 F.3d 146, 148 (8th Cir. 1997).

Orduno argues that she is entitled to a new trial due to: (i) cumulative, erroneous, and prejudicial evidentiary rulings at trial; (ii) the dismissal of Orduno's direct claims against the City; (iii) the ruling that six DPPA violations were at issue; (iv) the absence of the City on the Special Verdict Form; and (v) the absence of a jury instruction on the minimum statutory damage award. The Court addresses each argument in turn.

### 1. Evidentiary Rulings

Errors in evidentiary rulings are prejudicial only if the error likely affected the jury's verdict. Diesel Machinery, Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 833 (8th Cir. 2005).

### a. Exclusion of Time-Barred Accesses

Orduno argues that the Court erred in excluding evidence of Pietrzak's accesses of her driver's license data prior to May 2, 2010. Orduno contends that these accesses, which occurred on ten different dates before May 2, 2010, were relevant to Orduno's actual damages because they would have allowed the jury to know the full extent of Pietrzak's interest in her, and would have explained Orduno's fear, anxiety, and distress resulting from him accessing her records over a continued period of time. This argument is unavailing. The jury awarded Orduno $0 in actual damages even though it knew that Pietrzak had improperly accessed her information multiple times over a two-year period. There is nothing to suggest that the amount of damages would have been different had the jury known of the additional accesses (which remained disputed) over a longer time period.

Orduno also claims the time-barred accesses of her data were relevant to the issue of punitive damages because the total number of times Pietrzak broke the law demonstrated that

Pietrzak willfully and recklessly disregarded the law.  This argument is flawed because it assumes that the earlier, time-barred accesses were unlawful; Pietrzak's admission of liability was limited to the timely accesses, the time-barred accesses remained disputed.  Therefore, the time-barred accesses were not probative and would have:  (1) resulted in mini-trials over claims that were not in this case; (2) confused the jury as to what claims were at issue; and (3) unfairly prejudiced Pietrzak.  See Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

Orduno cites to the Eighth Circuit's decision in McDonough v. Anoka County to argue that the time-barred claims are admissible.  799 F.3d 931, 946 (8th Cir. 2015).  This argument is misplaced.  McDonough holds that at the pleading stage, time-barred accesses can be considered in conjunction with accesses within the actionable time period to determine whether a plaintiff has plausibly alleged a DPPA violation as to the timely accesses.  Id. at 946.  Here, Pietrzak admitted liability for the timely accesses, and the only remaining issue for trial was damages flowing from those six accesses.

**b. Exclusion of Third Party Data, Bankes Report**

Orduno also argues that the Court erred in excluding evidence of Pietrzak's accesses of other individuals, including her family members.  Orduno contends these accesses were relevant to proving her fear and emotional distress.  She further argues that Pietrzak's accesses of numerous other individuals listed in the Bankes Report demonstrated the reprehensibility and frequency of Pietrzak's wrongful conduct and was therefore relevant to the issue of punitive

damages.

Pietrzak's accesses of third parties were not relevant to actual damages because Orduno's damages under the DPPA must flow from the improper obtainment of <u>her</u> information.  <u>See</u> 18 U.S.C. § 2724(a) ("A person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual <u>to whom the information pertains</u>, who may bring a civil action in a United States district court.") (emphasis added).

Nor was Pietrzak's accesses of other individuals listed in the Bankes Report relevant to the issue of punitive damages.  Bankes never investigated the reasons for those accesses, and thus there was no foundation for concluding that they were wrongful.  As the Court noted when denying class certification in this case:

> Bankes did not request a record of service calls or an incident report from the City of Dayton for any of the individuals on the list, did not review any personnel files of [City] employees who were on the list, and did not interview Pietrzak about his reasons for accessing the individuals' data.  Bankes Dep. at 82–83.  Therefore, the list of accesses provided to Bankes by the DVS has not been sufficiently analyzed to determine whether the accesses were made for a permissible law enforcement purpose.

Class Cert. Order [Docket No. 54].

Not only was the evidence of third-party accesses irrelevant, it threatened to unfairly prejudice Pietrzak, confuse the issues, and mislead the jury.  Therefore, it was properly omitted.

### c.  Exclusion of the City of Dayton's Response

Orduno argues that the Court erred in not allowing the jury to know that the City took no disciplinary action against Pietrzak in response to the Bankes Report.  Orduno contends that the City's lack of discipline was relevant to showing the frequency and reprehensibility of the

improper conduct and the need to deter similar conduct. Pietrzak's password for DVS access was terminated by the time the City received the Bankes Report. Thus, the City's discipline or lack of it would not have been relevant to the frequency or reprehensibility of Pietrzak's conduct or to the deterrence of similar conduct by Pietrzak in the future.

### 2. Dismissal of Direct Liability Claim Against the City of Dayton

Orduno argues that her direct liability claim against the City should not have been dismissed and that the City should have been included on the Special Verdict Form, which would have allowed the jury to award damages against the City.

The DPPA defines a "person" who may be subject to liability under the Act as "an individual, organization, or entity, but does not include a State or agency thereof." 18 U.S.C. § 2725(2). Thus, the language of the statute contemplates direct liability for municipal entities like the City. See Rollins, 2016 WL 6818940 at *11 (stating DPPA statute contemplates direct liability for municipalities). However, to establish a violation of the DPPA, a plaintiff must show that a defendant (1) knowingly (2) obtained, disclosed or used personal information, (3) from a motor vehicle record, (4) for a purpose not permitted. McDonough, 799 F.3d at 945. Thus, to violate the DPPA, a defendant itself must have acted with an impermissible purpose; it is not enough that the defendant discloses information to one who subsequently uses it for an impermissible purpose. Mallak, 2017 WL 440249, at *14; Rollins, 2016 WL 6818940, at *11–12 (dismissing direct liability claim against city defendants because "[t]here is no evidence that the Cities knowingly provided the Officers with access to the DVS and BCA Databases for an impermissible purpose"); Potocnik, 2016 WL 3919950, at *6 (holding county defendant not directly liable under DPPA where county provided DVS access to employees for a permissible

18

law-enforcement purpose); <u>Weitgenant</u>, 2016 WL 1449572, at *4 (same); <u>Jessen</u>, 2014 WL 5106870, at *4 (same).

Here, the Complaint alleged no facts making it plausible that the City "knowingly" gave their Chief of Police access to the DVS Database "for a purpose not permitted" under the DPPA. 18 U.S.C. § 2724(a). The Complaint did not allege that Pietrzak should not have received access to the database for purposes of carrying out his law enforcement duties as police chief. Thus, the City did not knowingly obtain or disclose Orduno's information for an impermissible purpose.

Orduno argues that Defendants' Amended Answer admitted direct DPPA liability as to both Pietrzak and the City, and that this admission should have been binding. This argument lacks merit because Defendants admitted in the Amended Answer only that "<u>Defendant Pietrzak</u> knowingly obtained, disclosed, or used Plaintiff['s] . . . Private Data from a motor vehicle record for a purpose not permitted under the DPPA." <u>Compare</u> Compl. ¶ 207 <u>with</u> Am. Answer ¶ 65. The City maintained its denial of vicarious and direct liability. <u>Compare</u> Compl. ¶¶ 209–16, 223 <u>with</u> Am. Answer ¶¶ 67–70, 73. Nowhere in the Amended Answer does the City admit having knowingly obtained, disclosed, or used Orduno's private data for a purpose not permitted under the DPPA.

Orduno also insists that the City is directly liable because a government can only act through its employees or elected officials, and Pietrzak was a sufficiently high-ranking employee to bind the City. However, this is an argument supporting vicarious liability, rather than direct liability. <u>See</u> <u>Rollins</u>, 2016 WL 6818940, at *12 ("[Plaintiff] argues that because the Cities could only act through their Officers, the Officers' knowingly impermissible accesses of [Plaintiff's] personal information are attributable to the Cities. . . . But, this is an argument for

vicarious liability."); <u>Potocnik</u>, 2016 WL 3919950 at \*6 (same).

Additionally, any argument by Orduno that the City failed to monitor its employees' use of the database to ensure they were acting within the City's policies sounds in negligence, which falls short of the "knowingly" requirement under the Act.[5]

Thus, the Court did not err in dismissing the direct liability claim against the City or in excluding the City from the Special Verdict Form.

### 3. Court's Determination of the Number of DPPA Violations

Orduno argues that the Court usurped the role of the jury by determining as a matter of law that there were six DPPA violations at issue in the case. Pretrial Hr'g Tr. [Docket No. 287] 25:2–8; 26:5–23. Orduno contends that although Pietrzak's admitted violations occurred on six dates, testimony by Kim Jacobson, the Data Practices Coordinator for the Department of Public Safety, permitted a jury to find that twelve violations were at issue because Pietrzak accessed twelve different driver's license photos of Orduno over the course of the six occasions on which he accessed her information.

In ruling that six violations were at issue, the Court stated:

> I find as a matter of law that there are six obtainment dates and the plaintiff is entitled to damages for each of those six obtainments. I view the liquidated damages amount of $2,500 as setting a floor. The jury need not be advised of that. That's a post-judgment matter. So given the admission of liability, that's a $15,000 recovery, $2,500 per violation.

<u>Id.</u> at 25:2–8. Based on this pretrial ruling, the Court did not include a fact question regarding the number of times Pietrzak violated the DPPA.

---

[5] The value of such an argument is also mitigated by Orduno's position as Dayton's City Administrator. Orduno describes herself as Pietrzak's "boss." Pl.'s Resp. Defs.' Obj. at 4.

In Tichich v. City of Bloomington, the Eighth Circuit explained

> that sequential accesses occurring within a several-minute time span should be considered as one obtainment rather than several. While these close-in-time accesses fall within the technical meaning of "obtainment" . . . , in the absence of evidence to the contrary, we will view them as constituting one continuous gaining or acquiring of the same information by the same user at the same time, rather than as separate time-punctuated accesses.

835 F.3d 856, 867 (8th Cir. 2016), cert. denied, 137 S. Ct. 2246 (2017).  Here, each of the six occasions on which Pietrzak accessed Orduno's information lasted less than two minutes.  See Compl. Ex. A.  Thus, even if Pietrzak accessed multiple informational screens during these brief viewings, those sequential accesses "constitut[ed] one continuous gaining or acquiring of the same information by the same user at the same time, rather than as separate time-punctuated accesses."  Tichich, 835 F.3d at 867; see also Potocnik, 2016 WL 3919950, at *14 (stating that once the defendant accessed the plaintiff's record, "any steps [s]he took to navigate through that record during a continuous session do not count as separate obtainments").

Moreover, even if this ruling were in error, the error was not prejudicial.  Section § 2724(b) grants a court discretion regarding the remedies it "may" award and does not require a court to award liquidated damages for a violation.  See 18 U.S.C. § 2724(b) (stating "the court may award . . . (1) actual damages") (emphasis added).  In this case, even if the jury had found twelve violations, the Court would have only awarded actual damages for six of the violations, and would not have awarded more than $2,500 for a single viewing session, regardless of the number of photographs Pietrzak may have accessed during a given session.  Accordingly, the Court's ruling that six DPPA violations were at issue in this case was neither erroneous nor prejudicial.

### 4. Jury Instructions and Special Verdict Form

#### a. Absence of Definitions

Orduno argues that the Court erred by not including the definitions of "personal information" and "highly restricted personal information" in the jury instructions. A district court has broad discretion in framing instructions and need not give every proposed instruction as long as the court adequately presents the law and the issues to the jury. Fleming v. Harris, 39 F.3d 905, 907 (8th Cir. 1994). The instructions are to be considered in their entirety to determine whether, when read as a whole, the charge fairly and adequately submits the issues to the jury. Laubach v. Otis Elevator Co., 37 F.3d 427, 429 (8th Cir. 1994). "A single erroneous instruction will not necessarily require reversal." Id.

Here, the jury instructions adequately presented the law and the issues regarding DPPA damages to the jury. Although the definitions set forth in § 2725 of the DPPA distinguish between "personal information " and "highly restricted personal information," Orduno was seeking damages under § 2724, which makes no reference to "highly restricted personal information." Rather, a person is liable under § 2724 if that person "knowingly obtains, discloses or uses personal information" from a motor vehicle record for an impermissible purpose. 18 U.S.C. § 2724(a) (emphasis added). Thus, the jury instructions adequately presented the law and did not result in prejudicial error.

### b. Absence of the City of Dayton on Special Verdict Form

Orduno also argues that the Court erred in excluding the City from the Special Verdict Form as a directly liable party. As discussed above, the direct liability claim against the City was properly dismissed as a matter of law. The City's liability is limited to vicarious liability. Because Pietrzak was the only party being punished for a direct DPPA violation, the question of damages was directed toward his improper conduct. Thus, the exclusion of the City from the Special Verdict Form was neither erroneous nor prejudicial.

### c. Absence of Reference to Liquidated Damages

Orduno argues that the Court erred in not referencing the issue of statutory damages to the jury. As noted above, the Court stated in the pretrial conference:

> I find as a matter of law that there are six obtainment dates and the plaintiff is entitled to damages for each of those six obtainments. I view the liquidated damages amount of $2,500 as setting a floor. The jury need not be advised of that. That's a post-judgment matter. So given the admission of liability, that's a $15,000 recovery, $2,500 per violation.

Pretrial Hr'g Tr. at 25:2–8. Based on this ruling, no reference to liquidated damages was needed on the Special Verdict Form. There was no reason the jury needed to be apprised of the liquidated damage amount. The $15,000 liquidated damage award referenced by the Court will be incorporated into the amended judgment to be entered in this case.

## D. Orduno's Amended Motion to Amend Judgment

Orduno moves to amend the Judgment on two alternative bases. First, she argues that an amendment is necessary to correct the Court's error in finding only six obtainments of her information. As previously discussed, the Court ruled at trial, and continues to maintain that as a matter of law Pietrzak had accessed her information only six times during the statute of

limitations period.

Alternatively, Orduno argues that the Court should amend the existing Judgment to include the minimum liquidated damage recovery previously determined by this Court. At the pretrial conference, the Court determined that the liquidated damage recovery would be $15,000, which represents $2,500 per each of the six obtainments of Orduno's information. Orduno thus asks the Court to amend the Judgment to $100,000 ($85,000 in punitive damages plus $15,000 in liquidated damages). Defendants argue that Orduno may not recover liquidated damages under the DPPA because she failed to prove any actual damage.

Although the Eighth Circuit has not addressed the issue of whether a plaintiff must prove actual damages in order to recover liquidated damages under the DPPA, the two Circuit courts to have considered the issue have both held that proof of actual damages is not required. See Pichler v. UNITE, 542 F.3d 380, 397–400 (3d Cir. 2008); Kehoe v. Fid. Fed. Bank & Tr., 421 F.3d 1209, 1212–16 (11th Cir. 2005).

Section 2724(b) of the DPPA states:

> (b) Remedies.--The court may award--
>
>> (1) actual damages, but not less than liquidated damages in the amount of $2,500;
>>
>> (2) punitive damages upon proof of willful or reckless disregard of the law;
>>
>> (3) reasonable attorneys' fees and other litigation costs reasonably incurred; and
>>
>> (4) such other preliminary and equitable relief as the court determines to be appropriate.

18 U.S.C.. § 2724(b). Both Pichler and Kehoe have interpreted the phrase "but not less than

liquidated damages in the amount of $2,500" to create a damage award floor that is not

contingent upon proving actual damages.  <u>Pichler</u>, 542 F.3d at 398; <u>Kehoe</u>, 421 F.3d at 1213.  In

other words, "a plaintiff may receive the greater of [her] actual damages or $2,500."  <u>Pichler</u>,

542 F.3d at 398.

This interpretation comports with the purpose of liquidated damages, which "serve a

particularly useful function when damages are uncertain in nature or amount or are unmeasurable."

<u>Rex Trailer Co. v. United States</u>, 350 U.S. 148, 153 (1956).  As observed in <u>Kehoe</u>:

> [d]amages for a violation of an individual's privacy are a
> quintessential example of damages that are uncertain and possibly
> unmeasurable.  Since liquidated damages are an appropriate
> substitute for the potentially uncertain and unmeasurable actual
> damages of a privacy violation, it follows that proof of actual
> damages is not necessary for an award of liquidated damages.

421 F.3d at 1213.  Therefore, an award of liquidated damages is authorized and proper under the

DPPA even though she has not proven actual damages.[6]

Defendants contend that even if liquidated damages are awarded, the Court is not

required to multiply the liquidated damage award by each obtainment.  Defendants reason that

the DPPA does refer to awarding damages "per violation," and that when Congress intended to

include this language it knew how to do so.  The use of the word "may" in § 2724(b) ("[t]he

court may award") suggests that the Court has discretion in awarding damages.  <u>Pichler</u>, 542

F.3d at 394.  Additionally, the statute includes no limit on the district court's ability to grant

multiple awards for multiple violations.  <u>Id.</u>; <u>Ela v. Destefano</u>, — F.3d —, 2017 WL 3725593, at

*2 (11th Cir. Aug. 30, 2017) ("The text of the DPPA does not explicitly require per violation

---

[6] The Court recognizes, but chooses not to follow, <u>Potocnik</u>, which held that actual
damages are a prerequisite for liquidated damages under the DPPA.  2016 WL 3919950, at *10.

awards, but it does not seem to foreclose them either."). Therefore, courts have the authority and discretion under § 2747(b) to multiply the liquidated damage award by each obtainment. Pichler, 542 F.3d at 394.

The Court concludes that awarding liquidated damages of $2,500 for each of the six violations in this case is appropriate. Therefore, the Judgment will be amended to include liquidated damages of $15,000.

### E. Orduno's Motion for Attorneys' Fees and Costs

Orduno requests attorneys' fees of $352,993.25[7] and litigation costs of $74,767.76 for a total award of $427,761.01. The fee petition does not include time spent on class-related issues or time devoted to the case after a Rule 68 Offer of Judgment for $100,001.00 (exclusive of attorneys' fees) was served on March 31, 2017. Second Miller-Van Oort Aff., June 9, 2017 [Docket No. 236] ¶¶ 23–24. Defendants argue the fee petition is excessive and should be rejected completely or reduced significantly.

#### 1. Attorneys' Fees

Under § 2724(b)(3) of the DPPA, a court may award "reasonable attorneys' fees and other litigation costs reasonably incurred." The starting point for determining reasonable attorneys' fees is the "lodestar" calculation, which multiplies the number of hours reasonably expended on the litigation by a reasonable hourly rate. Hensley v. Eckerhart, 461 U.S. 424, 433 (1983); Hanig v. Lee, 415 F.3d 822, 825 (8th Cir. 2005). To determine whether an hourly rate is

---

[7] Orduno's fee petition initially requested $355,523.25 in attorneys' fees. However, Orduno's counsel subsequently filed an affidavit identifying time entries totaling $2,530 that were inadvertently included in the fee petition. See Holden Aff., June 30, 2017 [Docket No. 280] ¶¶ 5, 8. Orduno agrees that this amount should be excluded from the fee petition.

reasonable, the Court looks to the rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984). The court may also rely on its own experience and knowledge of prevailing market rates. Hanig, 415 F.3d at 825. In calculating a reasonable fee amount, courts should exclude hours that were not "reasonably expended," such as excessive or redundant hours, or instances where overstaffing or poor billing judgment has occurred. Hensley, 461 U.S. at 434.

The district court is afforded broad discretion in determining the reasonableness of an attorney fee award "because it has the greatest exposure to, and therefore understanding of, the proceedings before it." Shrader v. OMC Aluminum Boat Grp., Inc., 128 F.3d 1218, 1220 (8th Cir. 1997). "[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." Hensley, 461 U.S. at 437.

The degree of success "is the most critical factor in determining a reasonable fee award. There is no precise rule or formula for making fee determinations in cases with only partial success, and where . . . the court cannot separate out which hours were billed for which issues, [it] may simply reduce the award to account for the [plaintiff's] limited success." Warnock v. Archer, 397 F.3d 1024, 1026 (8th Cir. 2005) (internal quotations and citations omitted).

### a. Hourly Rates

Defendants argue that Orduno's fee petition must be reduced because the hourly rate of $400 charged by one of Orduno's attorneys is unreasonable. The Court finds that the hourly rate is reasonable based on counsel's skill and experience, the Court's knowledge and experience of prevailing market rates, and the rates awarded to the same attorney in comparable matters. See,

e.g., Myers v. Aitkin Cty., No. 14-473, R&R [Docket No. 187] at *6 (awarding $400 rate to same counsel in comparable matter), adopted in part 2017 WL 1134575, *4 (D. Minn. Mar. 27, 2017); Rasmusson v. City of Bloomington, No. 12-632, 2013 WL 3353931, *2–3 (D. Minn. July 3, 2013) (same).

### b. Hours Expended

Defendants also argue that the fee petition includes excessive and duplicative entries based on Orduno's use of eight attorneys and two paralegals from two law firms to perform work in this DPPA case. Defendants contend that the case was overstaffed with multiple timekeepers to perform work in the following categories: preparing Initial Disclosures (4 timekeepers, 27.35 hours); preparing the Complaint (5 timekeepers, 34.65 hours); responding to discovery (5 timekeepers, 42.35 hours); drafting discovery requests (5 timekeepers, 10.95 hours); and reviewing Defendants' discovery responses (4 timekeepers, 24.05 hours).

The Supreme Court has cautioned that cases subject to fee shifting statutes must not be "overstaffed," and that counsel should attempt to exclude from a fee request "excessive" or "redundant" hours, using the same "billing judgment" that they would apply in the private sector. Hensley, 461 U.S. at 433–34.

The Court agrees that the level of staffing and hours expended are excessive for this case alleging violations of a statute protecting personal information reflected on a driver's license. The case is not factually complex. After the dismissal of Orduno's time-barred claims in October 2014 and the denial of class certification in November 2015, the claims in this case were limited to one individual's accesses of Orduno's information on six occasions. Additionally, the legal issues involved are not particularly novel or difficult. The DPPA questions raised by this

case included the proper statute of limitations for DPPA claims, whether Minnesota's Department of Public Safety ("DPS") Commissioners can be held liable under the DPPA, the method for counting close-in-time accesses, and the imposition of direct or vicarious liability on municipalities. These issues are recurring themes throughout the dozens of DPPA cases filed in this District. Based on these circumstances, eight attorneys from two law firms were not necessary to litigate the case. The overstaffing resulted in excessive and redundant hours.[8]

The hours expended are also disproportionately high in relation to the volume of discovery and motion practice that actually occurred in this case. There were ten depositions, one motion to dismiss, two motions to compel discovery, one motion to quash a subpoena, one spoliation motion, and one settlement conference. Although the case was hard fought, the discovery and litigation activity was not extensive and does not justify the expenditure of $352,993.25 in attorneys' fees. To account for the excessive hours expended, the Court will apply a 40% reduction to the amount of fees requested.

### c. Degree of Success

Orduno argues that she obtained an excellent result by the jury's verdict of $85,000 in punitive damages. She notes that this is the first punitive damage award in a DPPA case in this District, and one of only four such awards in DPPA cases around the country.[9] Orduno further argues that this suit has also benefitted the public in general by exposing Pietrzak's misuse of

---

[8] As an example, the Complaint was drafted by five different attorneys and took nearly 35 hours to complete, even though substantial portions of the Complaint are identical to complaints filed in other DPPA cases in this District. Although allegation specific to Orduno are included in the Complaint, expending nearly 35 hours to customize the Complaint was excessive.

[9] Given the very limited number of DPPA cases which have been tried by a jury the significance of this statistic is questionable.

private data, holding the City liable for the misconduct, and motivating the City to improve it's officer's practices going forward.

The Eighth Circuit has recognized that when a civil rights lawsuit exposes official misconduct and provides an incentive to deter future misconduct, "a court assessing a particular plaintiff's relative degree of success may consider these non-monetary effects along with the personal monetary award a plaintiff receives." Lash v. Hollis, 525 F.3d 636, 642–43 (8th Cir. 2008). Although this is not a civil rights action, Orduno's suit was partially successful in that she obtained a total damage award of $100,000, exposed Pietrzak's misconduct, and potentially deterred future misconduct. This benefit has been taken into account in determining the appropriate award of attorneys' fees.

However, the success of Orduno's lawsuit must also be evaluated by recognizing the jury did not award any damages to Orduno. While it is true that liquidated damages are a substitute for actual damages and liquidated damages were awarded, neither Orduno nor the public benefitted from the jury's conclusion that the unlawful viewing of Orduno's driver's license records, without more, resulted in no actual damage to Orduno. Moreover, Orduno sought "liquidated, actual and compensatory damages in an amount in excess of $1,000,000," but only succeeded in obtaining the liquidated damages of $15,000 awarded by the Court. Compl. at 48. Based on Orduno's limited degree of success in this lawsuit, an additional 20% reduction in the total fees requested is fair and reasonable.

Reducing Orduno's total requested fees by 60% results in an attorney fee award of

$141,197.30.[10]

## 2. Costs

Orduno requests costs of $74,767.76.  Defendants argue that several of Orduno's costs are not recoverable, including expert witness fees and deposition transcripts of individuals who did not testify at trial.

### a. Expert Witness Fees

Orduno seeks $59,053.44 in costs paid to Computer Forensic Services ("CFS") to forensically analyze four of the City's computers that had potentially been used by Pietrzak.  Orduno retained CFS as a consultant to assist with electronic evidence pertaining to Orduno's allegations.[11]  Second Angolkar Aff., June 23, 2017 [Docket No. 255] Ex. 10 ("Lanterman Decl.") ¶ 3.  Defendants object to CFS's fees, arguing that expert fees are not recoverable under the DPPA.

The DPPA expressly permits the recovery of "reasonable attorneys' fees and other litigation costs reasonably incurred," but does not expressly permit recovery of expert fees.  18 U.S.C. § 2724(b); Menghi, 745 F. Supp. 2d at 114–15 (denying request for expert costs in DPPA case).  "[A]bsent explicit statutory or contractual authorization for the taxation of the expenses of

---

[10] Orduno also requests reimbursement for attorneys' fees and costs expended in replying to Defendants' response to her fee petition.  Because the arguments raised by Defendants in their response were not frivolous, Orduno's request for reimbursement of fees and costs incurred in preparing a reply is denied.

[11] Orduno contends that the forensic analysis was necessary "to determine what Defendant Pietrzak was doing at the time of the accesses and whether or how he used the information viewed of Ms. Orduno."  Second Miller-Van Oort Aff. ¶ 13.  Orduno avers that forensic analysis of four computers was necessary because the City did not know which computers were used by Pietrzak.  Id. ¶ 14.

a litigant's witnesses as costs, federal courts are bound by the limitations set out in 28 U.S.C. § 1821 and § 1920." Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 445 (1987). Neither § 1821 nor § 1920 authorize the recovery of expert witness fees. Orduno appears to concede this point by failing to address it in her Reply brief. Therefore, Orduno's requested costs will be reduced by $59,053.44 to reflect the disallowance of CFS's fees.

### b. Deposition Transcripts

Orduno also seeks to recover costs for the deposition transcripts of Sandra Borders,[12] Anne Ziebell, and Robert O'Brien. See Second Miller-Van Oort Aff. ¶ 28(d); Montpetit Aff., June 9, 2017 [Docket No. 237] Ex. B. Defendants argue these costs are not recoverable because these individuals did not testify at trial.

A district court has discretion to award costs for a deposition that was "necessarily obtained for use in a case and was not purely investigative." Zotos v. Lindbergh Sch. Dist., 121 F.3d 356, 363 (8th Cir. 1997) (alteration and internal quotation marks omitted). In determining whether depositions were necessarily obtained for use in a case, "the underlying inquiry is whether the depositions reasonably seemed necessary at the time they were taken." Id. (quotation marks omitted).

The briefs and affidavits filed in support of Orduno's fee petition do not state why the individuals were deposed, let alone whether the depositions reasonably seemed necessary at the time they were taken. Thus, on the record before it, the Court has no evidence upon which to conclude that the depositions were necessarily obtained for use in this case. As a result, Orduno

---

[12] The fee petition includes two charges for Sandra Borders' deposition. See Second Miller-Van Oort Aff. ¶ 28(d); Montpetit Aff. Ex. B.

may not recover the costs for the deposition transcripts of Sandra Borders (two transcripts totaling $937.30), Anne Ziebell ($357.40), and Robert O'Brien ($239.15).

### c. Other Costs

The Court has examined the other costs that Orduno seeks to recover and concludes they were reasonable and necessary. Therefore, the Court awards costs to Orduno of $14,180.47. This total represents the amount initially requested ($74,767.76), minus expert fees ($59,053.44), minus the costs of the above-referenced deposition transcripts ($1,533.85). The total of the attorney fee and cost award is $155,377.77.

## IV. CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff Samantha Orduno's Amended Motion to Amend Judgment Under Rule 59(e) and Rule 60(a) [Docket No. 259] is **GRANTED**;

2. Orduno's Motion for a New Trial Under Rule 59(a) [Docket No. 265] is **DENIED**;

3. Orduno's Motion for an Award of Reasonable Attorneys' Fees and Costs Under 18 U.S.C. § 274 [Docket No. 233] is **GRANTED IN PART** and **DENIED IN PART**;

4. Defendants City of Dayton and Richard Pietrzak's Motion to Strike Untimely Motion for New Trial, Untimely "Amended Motion" to Amend Judgment and Untimely Motion for Attorneys' Fees [Docket No. 269] is **DENIED**;

5. City of Dayton's Renewed Motion for Judgment as a Matter of Law [Docket No. 247] is **DENIED**; and

6.	The Judgment [Docket No. 229] shall be amended to add liquidated damages of $15,000 and attorneys' fees and costs of $155,377.77.


**LET AMENDED JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  September 29, 2017.